UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

| | | |
|---|---|---|
| CIBC PRIVATE WEALTH ADVISORS, INC. | : | __ Civ. ____ |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | |
| ERIN DICKES and EVY STEIN-KELLER, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------x

**VERIFIED COMPLAINT FOR**
**INJUNCTIVE AND OTHER RELIEF**

Plaintiff, CIBC Private Wealth Advisors, Inc. ("CIBC" or "Plaintiff") alleges as follows:

**THE NATURE AND SUMMARY OF THE ACTION**

1.      This is a civil action by CIBC against Erin Dickes ("Dickes") and Evy Stein-Keller ("Stein-Keller"), who were financial advisor employees of CIBC through July 28, 2022.

2.      Dickes and Stein-Keller signed employment agreements containing restrictive covenants prohibiting them from (a) soliciting, encouraging, inducing, or accepting business from clients they worked with at CIBC (or in Dickes' case, at her prior employer that CIBC purchased, including paying Dickes' for her equity in that employer) for 6 months for Dickes and 1 year for Stein-Keller, (b) possessing and using confidential information such as clients lists and contact information; and (c) soliciting employees of CIBC for 6 months.

3.      Dickes and Stein-Keller serviced their clients as a team at CIBC, along with a junior team member, Matthew Gerth.

4.      The vast majority of Dickes' and Stein-Keller's clients and client assets were obtained through (a) CIBC's referral arrangement with Schwab, for which CIBC compensates

Schwab (if these clients were to move their business to Dickes and Stein-Keller at their new employer, Morgan Stanley, CIBC would be required to pay substantial contractual fees to Schwab), (b) a similar referral arrangement between Schwab and Geneva Advisors, where Dickes and Stein-Keller were employed until CIBC purchased Geneva Advisors (including Dickes' equity in it) in 2017 for over $100 million, or (c) CIBC's assignment to them of clients of James Arado, a founding partner of Geneva Advisors who joined CIBC in 2017, upon his death in 2018.  In sum, Dickes and Stein-Keller did not independently originate the vast majority of their business with the clients they had at CIBC, but obtained them as a result of referral arrangements with Schwab that CIBC paid for either directly or indirectly through purchasing Geneva Advisors or by CIBC's decision to reassign Arado's clients to them upon his death.

5.      On April 29, 2022, Dickes and Stein-Keller, along with Gerth, gave notices of their resignations simultaneously to join a competitor, Morgan Stanley.  On information and belief, prior to giving notice, they coordinated that they would leave CIBC simultaneously to join Morgan Stanley as a team, *in violation of Dickes' and Stein-Keller's contractual obligations in their employment agreements with CIBC not to solicit employees.*

6.      Stein-Keller initially resigned immediately, *in violation of her contractual obligation to provide 90 days' notice*, before agreeing to serve the 90 days' notice.

7.      Dickes, simultaneously with giving notice, sent all of her clients an email from her CIBC email address announcing that she had given 90 days' notice but also that she then would be joining another firm, *in violation of her contractual obligation not to communicate with clients during her notice period without prior written approval from CIBC, and her contractual obligation not to solicit, encourage, or induce clients to engage her at another firm.*

8.      One business day after giving notice, Stein-Keller spoke to a client by phone, *in violation of her contractual obligation not to communicate with clients during her notice period without prior written approval from CIBC.*

9.      On information and belief, on that call Stein-Keller also *violated her contractual obligation not to, except on behalf of CIBC, solicit or attempt to solicit business; offer or attempt to offer services, offer to accept business, otherwise interfere or attempt to interfere with CIBC's relationship with the client.*

10.     Dickes' and Stein-Keller's attorney has indicated that they do not believe making an announcement to clients that they have joined Morgan Stanley would constitute soliciting, encouraging, inducing, or offering of their services to the clients at Morgan Stanley.  This makes clear that they intend to make such announcements, *in violation of their contracts.*

11.     Dickes' and Stein-Keller's attorney has further indicated that to make such an announcement to clients, they can use the confidential client names that they have memorized to look up the clients' contact information online to make such an announcement.  The client names are confidential and subject to the confidentiality clauses in their contracts, meaning using them would be *in violation of their contractual obligations not to use such confidential information.*

12.     Dickes' and Stein-Keller's attorney has indicated that they believe Stein-Keller's contractual obligation not to accept business from CIBC clients is unenforceable and inapplicable to her team-head Dickes, indicating that they intend to accept such business, *in violation of their contractual obligations.*

13.     July 28, 2022 was the last day of Dickes' and Stein-Keller's notice periods and employment with CIBC.

14.     It appears from their lawyer's communications that Dickes and Stein-Keller intend to start working at Morgan Stanley on Friday, July 29, 2022, and to immediately use

confidential client names they have memorized to look us the clients' contact information online, to make announcements to their CIBC clients that they are at Morgan Stanley, and to start accepting business from those clients, *all in violation of their contractual obligations to CIBC.*

15.    CIBC is therefore asking this Court to issue an immediate temporary restraining order, as well as preliminary and permanent injunctions, enforcing the restrictive covenant clauses in Dickes' and Stein-Keller's employment agreements with CIBC including prohibiting Dickes and Stein-Keller from (a) soliciting, encouraging, inducing, or accepting business from clients they worked with at CIBC (or in Dickes' case, at her prior employer that CIBC purchased, including paying Dickes' for her equity in that employer), including making clear that the prohibition on soliciting, encouraging, or inducing precludes making an announcement to their former clients that they are now working at Morgan Stanley, for 6 months for Dickes and 1 year for Stein-Keller from July 28, 2022; (b) possessing and using confidential information such as clients lists (in writing or memorized) and contact information; and (c) soliciting employees of CIBC for 6 months from July 28, 2022, and award money damages including for prior breaches and order disgorgement of Dickes' compensation for the period in which she violated the faithless servant doctrine.

16.    CIBC will suffer substantial and irreparable harm if defendants are permitted to breach their contracts.  Among other things, CIBC's  current and potential future ability to maintain relationships with the CIBC clients serviced by the defendants will be drastically compromised.

## THE PARTIES

17.     Plaintiff CIBC Private Wealth Advisors, Inc. ("CIBC") is an SEC-registered investment advisor incorporated in Delaware with its principal place of business at 3290 Northside Pkwy, 7th Floor, Atlanta, Georgia 30327 (discussed further below).

18.     Defendant Erin Dickes ("Dickes") is an individual employed by CIBC as a financial advisor with the title Senior Relationship Manager through July 28, 2022, who resides in Dallas, Texas (and also maintains a residence in Illinois, where she initially worked for CIBC before working in CIBC's office in Dallas while also maintaining an office in Chicago, Illinois).

19.     Defendant Evy Stein-Keller ("Stein-Keller") is an individual employed by CIBC with the title Senior Client Service Manager through July 28, 2022, who resides in East Dundee, Illinois.

## SUBJECT MATTER JURISDICTION

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

21.     CIBC is incorporated in Delaware with its principal place of business in Georgia. While CIBC has its main corporate offices in Chicago, Illinois, it is ultimately managed from Atlanta, Georgia.

22.     CIBC's CEO, John "Jack" Markwalter, is located in Atlanta, Georgia.

23.     CIBC Private Wealth Management is a trade name for the bundle of businesses, including CIBC, that are run by CIBC Private Wealth Group, LLC ("CIBC PWG"), the parent company of CIBC.  CIBC PWG's principal place of business is in the Atlanta, Georgia headquarters.

24.     The CEO of CIBC Private Wealth Management and CIBC PWG is Mr. Markwalter (who as stated above is also the CEO of CIBC).  He is located in Atlanta, Georgia.

25.     Mr. Markwalter signed both plaintiffs' employment agreements that are at issue, as Chairman and CEO of Atlantic Trust, the business brand since changed to CIBC Private Wealth Management, and Atlantic Trust Group, LLC, which is now named CIBC PWG.  Mr. Markwalter was and is based in Atlanta, Georgia, and signed plaintiffs' employment agreements in Georgia.

26.     Mr. Markwalter is often directly involved with communicating with important clients of CIBC.

27.     Mr. Markwalter is the direct manager of key personnel of CIBC, including the President of CIBC, Eric Propper.

28.     In fact, upon defendants' providing notice of their resignations from CIBC, Mr. Markwalter has communicated directly with the clients that worked with defendants' team in an effort to ensure a smooth transition to new financial advisors at CIBC.  Mr. Markwalter sent emails to all of Dickes' clients to whom Dickes emailed her April 29 announcement of her departure from CIBC to join another firm.  (See, e.g., Exhibit 15)  He also communicated with many of the clients who worked with defendants' team beyond sending those emails, including in phone calls from Georgia.

29.     The General Counsel of Private Wealth Management is also located in Georgia.

30.     Also located in Georgia are CIBC's Southeast Regional Team Executive, to whom Dickes directly reported.

31.     Also located in Georgia are CIBC's Executive Director of Client Initiatives and the Head Equity Trader and Managing Director of Wealth Trading.

32.     Dickes is a citizen of Texas.

33.     Stein-Keller is a citizen of Illinois.

34.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## **PERSONAL JURISDICTION**

35.     The employment agreements at issue that Dickes and Stein-Keller signed contain New York choice-of-law clauses.  Both agreements provide that "The terms of this letter will be governed by, and understood and enforced according to the laws that apply to contracts made and to be performed in the State of New York, without regard to conflict of law principles." (Exhibits 1 and 2 at Section 5).

36.     Dickes' Seller Member Agreement, by which on July 7, 2017 she sold her equity interests in the business she was employed by to Atlantic Trust Group, LLC, which is now CIBC Private Wealth Group, LLC, also contains a New York choice-of-law clause.

37.     The employment agreements do not contain choice-of-forum clauses.  They contain clauses requiring arbitration "[e]xcept as otherwise provided in Section 4 of this letter". (Exhibits 1 and 2 at Section 5).  Section 4 of the letter agreements provides:

> *Equitable Remedies*.  You specifically recognize that any breach by it [sic] of this Section 4 will cause irreparable injury to CIBC and that actual damages will be difficult to ascertain, and in any event, may be inadequate.  Accordingly, you further expressly consent to the issuance of a temporary restraining order or a preliminary injunction by any court with jurisdiction over you to prohibit the breach of this Section 4.
> (Exhibits 1 and 2 at Section 4(h)).

38.     At the time Dickes and Stein-Keller went through the process of signing their employment agreements and being hired by CIBC in 2017, CIBC's Human Resources function was based in New York City.

39.     That is why their employment agreements contained New York choice-of-law clauses.  Companies prefer to have employment agreements for their employees governed by one

state's laws rather than by many different state's laws, depending on the employee.  That is one main purpose for choice-of-law clauses.

40.     CIBC Human Resources employees in New York were involved in the process of Dickes' and Stein-Keller's hiring and onboarding as CIBC employees.

41.     Both Dickes and Stein-Keller were FINRA registered representatives with an affiliate of CIBC, CIBC World Markets Corp.  CIBC World Markets Corp.'s principal place of business is in New York, New York.

## VENUE

42.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of property that is the subject of the action is situated within this district, and a substantial part of the events giving rise to CIBC's claims occurred within this district.

## FACTS

43.     Defendant Dickes has been a financial advisor since 2003.  Prior to joining CIBC, from 2005 to 2017, she was employed by Geneva Advisors.  Dickes also had an equity ownership interest in Geneva Advisors.

44.     Defendant Stein-Keller has been a financial advisor since 1997.  Prior to joining CIBC, from 2003 to 2017, Stein-Keller was employed by Geneva Advisors.

45.     Dickes and Stein-Keller worked as a team at Geneva Advisors servicing individual clients.

46.     In 2017, Atlantic Trust Group, LLC, now named CIBC PWG, parent of CIBC, purchased Geneva Advisors and related entities for well over $100 million.

47.     Dickes' entered into a Seller Member Agreement with Atlantic Trust Group, LLC, dated July 7, 2017 (Exhibit 3).

48.     Dickes simultaneously entered into an employment agreement with Atlantic Trust, also dated July 7, 2017 (Exhibit 1).

49.     Shortly thereafter, Stein-Keller entered into an employment agreement with Atlantic Trust, dated August 16, 2017 (Exhibit 2).

50.     Stein-Keller did not own equity in Geneva Advisors, but did receive retention payments as a result of CIBC's acquisition of Geneva Advisors.

51.     Pursuant to Dickes' Seller Member Agreement, she received substantial compensation for her equity share of Geneva Advisors.  In addition, Dickes received over $1 million as a retention payment.

52.     Dickes' Seller Member Agreement provided, among other things, for a 3-year non-compete and corollary non-solicit of clients and employees that ran through 2020.

53.     Dickes' employment agreement refers to her Seller Member Agreement and its Purchase Agreement with Geneva Advisors, and provides:

> You currently own equity in Geneva Holding Company of Chicago, LLC, the current owner of the Companies in the pending transaction, and will indirectly receive consideration on or after the Closing Date as part of the purchase of the Companies by CIBC by virtue of your ownership interest in Geneva Holding Company of Chicago, LLC.  In consideration of the mutual covenants contained herein and in consideration of CIBC's willingness to enter into the Purchase Agreement and acquire the Companies and other good and valuable consideration, CIBC and you agree to the terms of this letter agreement as follows.

54.     Section 3 of Dickes' CIBC employment agreement provides:

> You may terminate your employment at any time by providing CIBC with 90 calendar days' written notice of your resignation. During this Notice Period:
>
> a.   We may reduce or change of your duties and responsibilities;
>
> b.   We may relieve you of your duties, require that you do not come in to the workplace, and/or place you on a paid leave of absence;

c.  You will continue to receive salary and, to the extent permitted by the terms of the applicable plans, benefits that would otherwise be applicable;

d.  You are not eligible for any incentive cash award, bonus or other forms of discretionary compensation.

e.  You will not directly or indirectly work for any person (other than CIBC), and will not have any contact with any client of CIBC or have any contact for business purposes with any employee of CIBC, without our prior written consent.

...

*Return of Property* - All CIBC property, including any Confidential Information (as hereafter defined) stored in computer memories, computer disks or by any other means, shall be delivered, along with any copies thereof, to CIBC promptly upon the last day of your active employment with CIBC, or at any other time upon request, and you confirm that you shall not keep any reproductions thereof. At any time you may be required to account for, and deliver, as directed, all monies, securities and other property which you have received from or on behalf of CIBC.

55.  Section 4 of Dickes' CIBC employment agreement, "Restrictive Covenants," provides (emphases added):

**4. Restrictive Covenants**

You acknowledge and agree that you are subject to the Seller Member Agreement with Atlantic Trust Group, LLC dated as of the date hereof (the "Seller Member Agreement"), pursuant to which you have agreed to certain non-competition, non-solicitation and other restrictive covenants in connection with the transactions contemplated by the Purchase Agreement and your expected receipt of proceeds from the transaction contemplated by the Purchase Agreement. In addition, and not in derogation of the foregoing, you agree as follows:

(a)     *Reserved.*

(b)     ***Non-Solicitation of Clients***. **During the term of your employment and** for the longer of a period of **6 months** following the termination of your employment for any reason (the "Non-Solicitation Period") or the Non-Competition Period as described in the Seller Member Agreement, you shall not, and shall ensure that your Affiliates, other than any other present member of Geneva Holding Company of Chicago, LLC (you and your Affiliates (other than any other present member of Geneva Holding Company of Chicago, LLC), collectively, for purposes of this Section 4, the

"Restricted Parties") do **not, solicit, induce or encourage any Business Client** to engage you, or any person to whom you provide services, as an employee, consultant, or otherwise with respect to any other participant, any entity, enterprise or business that provides, or that has an Affiliate that provides, wealth management, investment advisory, investment management, investment counseling, fiduciary and related asset management services in respect of liquid equity investments or fixed income investments in the United States for high net worth individuals, their families, foundations and/or endowments, as well as institutions, including through pooled investment vehicles and wrap, manager of managers, advisory, referral and similar arrangements, other than in furtherance of your performance of your responsibilities as an employee of CIBC. For purposes hereof, "Business Client" means (i) any Person who is, or whose Affiliate is, as of the later of the Closing Date or the date of your termination, or who was, or whose Affiliate was, at any time during the period of twelve (12) months prior to the date of your termination (the "Relevant Period"), a client of CIBC Group of Companies and with whom you became acquainted during your employment with CIBC Group of Companies, and/or during your employment with the Companies prior to the Closing, or any Person to whom, or to whose Affiliate, you had, within the Relevant Period, affirmatively offered (e.g., "pitched") to undertake services of the nature contemplated in this Section 4(b).

(c)     *Non-Solicitation of Employees*. During the longer of the Non-Solicitation Period as stated in this Agreement or the Non-Competition Period as described in the Seller Member Agreement, you shall not, and shall ensure that each other Restricted Party does **not, directly or indirectly, solicit for employment or hire** any employee of CIBC who was an employee of CIBC prior to your termination date (collectively, the "Applicable Employees"); provided that this Section 4(c) shall not prohibit you from hiring any Applicable Employee who was terminated by CIBC or placing general solicitations in newspapers or other periodicals or through the Internet for any purpose, including soliciting employees or consultants to hire or engage such persons in your business, provided that such solicitations are not specifically directed to Applicable Employees.

(d)     *Confidentiality*. You agree to keep confidential, and not divulge or discuss, or cause anyone to divulge or discuss, either directly or indirectly, the existence of this letter, guaranteed amounts or other terms contained in this letter, or the facts or circumstances related thereto, other than personal advisors assisting you in considering this letter (it being understood that such

persons will be informed by you of the confidential nature of the terms of this letter and will agree to be bound by the confidentiality provisions hereof prior to any disclosure). In addition, you will have access, or be privy, to confidential information regarding one or more members of CIBC including, but not limited to, **client lists**, account information, information about business practices, finances, products, services, strategies, work product (described below), trade marks, trade names or other proprietary information or rights, licenses, and **information about** suppliers, employees, and **clients (whether personal, financial or otherwise) ("Confidential Information")**. The disclosure or use of Confidential Information, other than as required and directed in the normal course of your employment, would be highly detrimental to the interests of CIBC. During your employment, and at all times thereafter, you must keep all Confidential Information in strict confidence, and not disclose, retain, or use any Confidential

Information for the benefit, purposes or account of yourself or another person, firm, corporation or other entity, unless properly authorized to do so; provided, that such restrictions shall not apply to (i) any information that becomes publicly available without any disclosure by you in violation of this Section 4(d), (ii) any information that is received by you from a third Person (provided that such third Person is not known by you to be bound by an obligation of confidentiality owing to CIBC with respect to such information), (iii) any information that is generated independently by you without reference to or use of any such confidential information or (iv) any disclosure required by applicable law or any governmental authority, so long as notice of such disclosure is given to CIBC, and you exercise commercially reasonable efforts to cooperate with CIBC in using reasonable commercial efforts to resist such disclosure. Nothing in this Confidentiality provision prohibits you from reporting possible violations of applicable law or regulation to any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation.

(e)    *Trade Secrets.* In compliance with 18 U.S.C. § 1833(b) ("Section 1833(b)(l)"), as established by the Defend Trade Secrets Act of 2016, you are given notice of the following immunities listed in Sections 1833(b)(l) and (2) (Immunity From Liability For Confidential Disclosure Of A Trade Secret To The Government Or In A Court Filing): (1) IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. (2) USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION LAWSUIT. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

(f)    ***Property***. You will protect all Confidential Information and all other property belonging to CIBC at all times. Any work product (including, but not limited to, procedures, programs or designs) that you develop in the course of your employment

(whether alone or with others) is the sole property of CIBC immediately upon its creation and at every stage of its development, and you hereby irrevocably assign all rights, title and interest in and to any and all such work product, and waive all moral rights thereto, to CIBC. At any time during or following your employment, you may be **required to account for, deliver and/or destroy as directed, all Confidential Information, monies, securities and all other property that you have received from, or on behalf of, CIBC**.

(g)     *Acknowledgment and Intention.* You understand and acknowledge that the **restrictive covenants and other agreements contained in this Section 4 are an essential part of this letter and the transactions contemplated by the Purchase Agreement and that CIBC would not have agreed to the transactions contemplated by the Purchase Agreement if not for such restrictive covenants and other agreements**. It is the intention of the parties that, if any of the restrictions or covenants contained herein are held to cover a geographic area or to be for a length of time that is not permitted by Applicable Law, or is in any way construed to be too broad or to any extent invalid, such provision shall not be construed to be null, void and of no effect, but to the extent that such provision would then be valid or enforceable under Applicable Law, such provision shall be construed and interpreted or reformed to provide for a restriction or covenant having the maximum enforceable geographic area, time period and other provisions as shall be valid and enforceable under Applicable Law.

(h)     ***Equitable Remedies. You specifically recognize that any breach by it [sic] of this Section 4 will cause irreparable injury to CIBC and that actual damages will be difficult to ascertain, and in any event, may be inadequate. Accordingly, you further expressly consent to the issuance of a temporary restraining order or a preliminary injunction by any court with jurisdiction over you to prohibit the breach of this Section 4.***

(i)     *Defined Terms.* Capital terms used but not defined in this Section 4 shall have the meanings assigned to them in the Seller Member Agreement.

(j)     *Maximum Effect.* It is the intention of the parties to this letter that, if any of the restrictions or covenants contained herein are held to cover a geographic area or to be for a length of time that is not permitted by applicable law, or is in any way construed to be too broad or to any extent invalid, such provision shall not be construed to be null, void and of no effect, but to the extent that such provision would then be valid or enforceable under applicable law, such provision shall be construed and interpreted or reformed to provide for a restriction or covenant having the maximum enforceable geographic area, time period and other provisions as shall be valid and enforceable under applicable law.

56.     Section 4(g) above of Dickes' CIBC employment agreement reflects that the price CIBC's parent paid to purchase Geneva Advisors, including Dickes' ownership interest, was partly in exchange for the restrictive covenants CIBC is seeking to enforce.

57.     Section 5 of Dickes' employment agreement contains a New York choice-of-law clause, providing that "*Governing Law, Arbitration*.  We require that every employee agree to resolve any employment disputes with CIBC amicably or, if necessary, through an arbitration process.   The terms of this letter will be governed by, and understood and enforced according to laws that apply to contracts made and to be performed in the State of New York, without regard to conflict of law principles. Except as otherwise provided in Section 4 of this Agreement, any controversy or claim arising out of or relating to this letter, your employment, or the termination there from, including, for example, any claim for breach of contract, tort, discrimination, sexual or other harassment, retaliation, the violation of any state, federal or local or other statute, regulation or ordinance, or the common law or public policy, shall be submitted to final and binding arbitration."

58.     Section 5 of Dickes' CIBC employment agreement also provides: "*Assignment -* The rights and obligations of CIBC (regardless of whether they are specifically stated herein) will be transferable, and all of its covenants and agreements will be binding

upon, and be enforceable by its successors and assigns, including but not limited to CIBC, and any of its subsidiaries and affiliates. You may not assign this letter." The beginning of the agreement references Canadian Imperial Bank of Commerce and defines CIBC as "CIBC or one of its subsidiaries or affiliates (collectively referred to herein as "CIBC")".

59.     Stein-Keller's employment agreement (Exhibit 2) is essentially the same as Dickes', with some exceptions.  She did not own equity in Geneva Advisors, so while the transaction is referenced, there is no reference to her selling equity.

60.     Also, Stein-Keller's non-solicit of clients clause is a non-divert, prohibiting not just soliciting clients but also accepting business from clients:

**4. Restrictive Covenants**

You agree as follows:

(a)     *Prohibition on Client Diversion.* You agree to refrain, while employed by CIBC and for a period of **1 year** following the termination of your employment for any reason (the "Non-Competition Period"), from **Diverting or attempting to Divert** from CIBC any Client you learned of or provided services to while affiliated with CIBC, except as expressly provided in writing by an officer of CIBC. For purposes of this Section 4(a), the following terms shall have the following meanings:

(i)     "Account" means an investment or investment account with, through, managed, or otherwise associated with CIBC, regardless of whether the account is charged a fee by CIBC and including without limitation any Alternative Investment Account, as defined in the Representatives' Compensation Guide.

(ii)     "Client" means any person or entity (i) with one or more Accounts; (ii) who or which had one or more Accounts within 12 months prior to your termination of employment with CIBC; and/or (iii) who or which was solicited to open an Account or use Services offered by CIBC within the 12 months prior to your termination of employment with CIBC.

(iii)     **"Divert" means directly or indirectly (i) solicit**

16

**or attempt to solicit business; (ii) offer or attempt to offer Services (as defined below); (iii) accept or offer to accept business from or payments for Services from; or (iv) otherwise interfere or attempt to interfere with any Company relationship.**

(iv)  "Services" means all activities relating to offering investment management and advice on publicly traded securities to any person or entity by any means. Services includes but is not limited to management of hedge or mutual funds or commingled or separate investment account vehicles. Services further includes but is not limited to research analysis, portfolio management, financial planning and any activity that supports investment management and advice. Services excludes management or investment services to any private equity fund or any similar investment fund that specializes solely in investments in private companies not listed on any public stock exchange.

61.     From 2017 until July 28, 2022, Dickes and Stein-Keller remained employed by CIBC and functioned as a team, with Dickes the leader of the team.

62.     Another employee of CIBC, Matthew Gerth, was a junior member of their team. He was an Associate Vice President and client service manager.  In that role, he worked closely with senior relationship managers to respond to client inquiries and provide client service, account administration and reporting to high net worth individuals, families, foundations and endowments.

63.     Dickes and Stein-Keller were both SEC-registered investment advisors through CIBC.

64.     CIBC itself is an SEC-registered investment advisor.

65.     Dickes and Stein-Keller were both also FINRA registered representatives through CIBC's affiliate broker-dealer CIBC World Markets Corp., which is a FINRA member firm.

66.     However, all of Dickes' and Stein-Keller's clients signed Investment Management Agreements with CIBC, the SEC-registered investment advisor -- not the FINRA member firm CIBC World Markets Corp.

17

67.    For almost all of their activities, Dickes and Stein-Keller did not need to be FINRA registered representatives.  For almost all of their activities, they functioned as SEC-registered investment advisors, not FINRA registered representatives.

68.    CIBC has SEC-registered investment advisors become FINRA registered representatives through CIBC World Markets Corp. only so they have the ability under the applicable rules and regulations to solicit business and receive direct compensation for clients who invest in specific alternative investment offerings (i.e., private limited partnership funds) (beyond recommending the use of alternatives as a general asset allocation decision).

69.    The portion of client assets invested such that Dickes and Stein-Keller were required to be FINRA registered investment advisors was insignificant.

70.    And neither Dickes nor Stein-Keller has engaged in recent activity like this for which they were required to be FINRA registered representatives.

71.    The vast majority of Dickes' and Stein-Keller's clients and client assets were obtained through (a) CIBC's referral arrangement with Schwab, for which CIBC compensates Schwab (if these clients were to move their business to Dickes and Stein-Keller at their new employer, Morgan Stanley, CIBC would be required to pay substantial contractual fees to Schwab), (b) a similar referral arrangement between Schwab and Geneva Advisors, where Dickes and Stein-Keller were employed until CIBC purchased Geneva Advisors (including Dickes' equity in it) in 2017 for over $100 million, or (c) CIBC's assignment to them of clients of James Arado, a founding partner of Geneva Advisors who joined CIBC in 2017, upon his death in 2018.

72.    In sum, Dickes and Stein-Keller did not independently originate the vast majority of their business with the clients they had at CIBC, but obtained them as a result of referral

arrangements with Schwab that CIBC paid for either directly or indirectly through purchasing Geneva Advisors or by CIBC's decision to reassign Arado's clients to them upon his death.

73.     CIBC has spent significant sums of money establishing goodwill with the clients, including but not limited to by purchasing Geneva Advisors and by paying Schwab for client referrals.

74.     If these clients were to move their business to Dickes and Stein-Keller at their new employer Morgan Stanley, CIBC would be required to pay substantial contractual fees to Schwab – both on clients that had been referred by Schwab during Dickes' and Stein-Keller's employment at CIBC, and on clients that had been referred by Schwab to Geneva Advisors.

75.     At the time of her resignation from CIBC, Dickes had over 200 clients where she was the primary Relationship Manager, with approximately $1.2 billion in assets under management at CIBC.

76.     At the time of her resignation from CIBC, Stein-Keller had over 30 clients for which she received direct compensation, with over $350 million in assets under management at CIBC. Dickes was the primary Relationship Manager on Stein-Keller's clients.

77.     CIBC has paid Dickes approximately $2.4 million in the 12 months preceding her resignation.

78.     CIBC has paid Stein-Keller approximately $190,000 in the 12 months preceding her resignation.

79.     Virtually simultaneously on late Friday afternoon on April 29, 2022, Dickes, Stein-Keller, and Gerth all gave written notice on the same day of their resignations from CIBC to join Morgan Stanley. (Exhibits 4, 5, and 6).

80.     Their notices were virtually identical, including notifying CIBC of the name of the lawyer.  The three of them shared the same lawyer.

81.     Dickes gave 90 days' notice of her resignation.

82.     In Stein-Keller's notice, she resigned "effective immediately" – *in violation of her contractual 90-day notice period.*  (Exhibit 5).

83.     Gerth had no contractual notice period, and so resigned immediately and immediately began working at Morgan Stanley.

84.     On information and belief, prior to giving notice, Dickes, Stein-Keller, and Gerth communicated with each other, either directly and/or through Morgan Stanley and/or through their shared lawyer, about wanting to leave CIBC and about pursuing and accepting employment at Morgan Stanley together to continue working as a team.

85.     On information and belief, Dickes, Stein-Keller, and Gerth were aware prior to giving notice to CIBC that each other was also going to give notice to CIBC to join Morgan Stanley together.

86.     On information and belief, Dickes, Stein-Keller, and Gerth directly or indirectly solicited each other to leave CIBC and join Morgan Stanley – *in violation of Dickes' and Stein-Keller's contracts.*

87.     On late Friday afternoon on April 29, 2022, Dickes, virtually simultaneously with giving CIBC her notice of resignation, sent to clients a blast email using her CIBC email address and the client email addresses that were CIBC Confidential Information under her contract (emphasis added):

> Dear Friends, It has been a pleasure working with you and your families over the past many years. I am writing to let you know that I intend to resign today from CIBC. It is my understanding that CIBC wants me to provide 90 days' notice of my intended resignation prior to **commencing**

20

**employment with my new firm**, and I intend to honor CIBC's request. I am grateful for the opportunity to be of service to you, and hope that CIBC will permit me to assist you during the transition. Sincerely, Erin

(Exhibit 7).

88.     *Dickes' April 29 email violated her contract* in several ways, including (a) Section 3's requirement that during her 90-day notice period she "will not have any contact with any client of CIBC or have any contact for business purposes with any employee of CIBC, without our prior written consent," and (b) Section 4's requirement that she not *"solicit, induce or encourage any Business Client"* to engage her at another firm.

89.     Dickes did not simply notify her clients that she had given notice of her resignation, but affirmatively informed them that she would be joining another firm at the end of her 90-day notice period.

90.     Dickes deliberately sent this email at the same time as giving notice to CIBC because she anticipated that CIBC would not allow her to communicate with clients during her notice period per the language in her contract, and certainly would not allow her to use CIBC's email system and list of client email addresses to essentially announce to them that she would be joining another firm to compete with CIBC for these clients at the end of her notice period.

91.     Dickes sent this email to clients in an attempt to alert and encourage CIBC clients to follow her to her future employer and to destabilize the client relationship with CIBC.  She sought to impede the ability of the new CIBC financial advisors who would begin working with these clients during the notice period to establish a relationship with such clients -- which is the purpose of the notice period.

92.     The next day, April 30, 2022, CIBC emailed letters to Dickes and Stein-Keller reminding them of their contractual obligations to CIBC, including their notice periods, non-

solicit/divert of clients, and non-solicit of employees, and obligations regarding confidential information and returning CIBC property, and copying Morgan Stanley.  (Exhibits 8 and 9).

93.    On May 1, 2022, CIBC emailed a letter to Gerth reminding him of his contractual obligations to CIBC regarding confidential information and returning CIBC property, copying Morgan Stanley.  (Exhibit 10).

94.    On May 1, 2022, CIBC emailed a letter to Morgan Stanley further putting it on notice of the contractual obligations of Dickes, Stein-Keller, and Gerth.  (Exhibit 11).

95.    On May 2, 2022, the attorney for Dickes and Stein-Keller emailed CIBC's in-house counsel indicating that they would serve their notice periods despite Stein-Keller's having initially given notice of her immediate resignation.  (Exhibit 12).

96.    Dickes' and Stein-Keller's attorney's email stated that they would comply with their "legally enforceable post-employment obligations to CIBC," indicating that he believed some of these obligations were not legally enforceable and that Dickes and Stein-Keller would not comply with all of their contractual obligations.

97.    The attorney also stated that Stein-Keller would not comply with CIBC's direction that she come to the office to work during her notice period, in part because of her "potential vulnerability to COVID," but would instead work remotely.

98.    This was in *violation of her contractual obligations under Section 3 of her contract, which gave CIBC the right to direct her activities during her notice period, including coming to the office or not.*

99.    Meanwhile, Stein-Keller had posted on her publicly available Facebook page photographs showing her maskless indoors at restaurants just a few weeks earlier on March 30, 2022 and April 9, 2022.  (Exhibits 13 and 14).  This demonstrates that it was a lie that Stein-

Keller's "potential vulnerability to COVID" was the reason she was refusing to come to the office, and she was intentionally refusing to comply with her contractual obligations.

100.    Their attorney's May 1 email also stated that "I am not comfortable with my clients performing duties for CIBC until we have had an opportunity to discuss the activities in which CIBC anticipates having them participate during the notice period, and the parameters governing those activities."

101.    This was in *violation of Dickes and Stein-Keller's contractual obligations under Section 3 of their contracts to determine their duties during their notice periods.* It was not up to them to decide what duties they were "comfortable" performing. It was insubordinate.

102.    On Monday, May 2, 2022, a client of the Dickes-Stein-Keller team emailed Dickes forwarding an email from CIBC management informing the clients of the team's notice of resignation and introducing their replacements, and wrote (emphasis added): "Thought you might like to see this…..if you haven't got it yet. **I talked to Evy today**….**will call you later this week**." (Exhibit 15).

103.    This email reflected that Stein-Keller had *violated her contractual obligation not to communicate with clients during her notice period per Section 3 of her contract.*

104.    On information and belief, in that May 2 call with the client, Stein-Keller also *violated her contractual obligations, which required in Section 4 that she not* "Divert" or attempt to Divert, with Divert defined to mean "directly or indirectly (i) *solicit or attempt to solicit* business; (ii) *offer or attempt to offer Services* (as defined below); (iii) accept or *offer to accept business* from or payments for Services from; or (iv) *otherwise interfere or attempt to interfere with any Company relationship*."

105.    Stein-Keller did not notify CIBC that she had communicated with a client during her notice period in violation of her contract.

106.    On May 3, 2022, CIBC delivered directly to Dickes and Stein-Keller copies of a letter emailed to their attorney re-iterating their legal obligations and their enforceability and noting breaches of contract that had already occurred.  (Exhibit 16).

107.    In a May 4, 2022 letter emailed to CIBC's counsel, Dickes' and Stein-Keller's attorney denied that Dickes' email to clients or Stein-Keller's client call constituted solicitation in violation of their contractual obligations.  (Exhibit 17).

108.    In that May 4 letter, their attorney claimed that FINRA Rule 2273 requires departing registered representatives to deliver a communication to former clients upon change of firms regarding their new employment status, indicating that they intended to further *violate their contractual obligations by making an announcement to clients upon starting at Morgan Stanley that they were now working* there.

109.    Their attorney's May 4 letter also stated, "nor do they intend to breach any *valid* non-solicitation obligations," implying that they intended to *violate the portions of their contractual non-solicit obligations that they believe are invalid.*  (Emphases added).

110.    On May 5, 2022, CIBC's counsel's emailed a letter to Dickes' and Stein-Keller's attorney pointing out that FINRA Rule 2273 did not override their contractual non-solicit obligations:  "That same Federal Register Vol. 81, No. 60 you cited emphasizes that "FINRA states that it does not intend the proposed rule [2273] to impact any contractual agreement between a representative and his or her former firm or new firm ... FINRA notes that the proposed rule change assumes that recruiting firms and representatives will act in accordance with the contractual obligations established in employment contracts".

111.    On July 6, 2022, CIBC's counsel emailed a letter to Dickes' and Stein-Keller's attorney re-iterating their contractual obligations and providing legal support for their enforceability.

112.    On July 21, 2022, Dickes' and Stein-Keller's attorney emailed a letter to CIBC's counsel stating, among other things:  "However, your insistence that my clients may not accept customer transfer requests based on Ms. Stein-Keller's contract is simply unsupportable under FINRA rules and the caselaw construing these rules."  (Exhibit 18).

113.    That letter also asserted that "customers have 'a paramount right' to be advised of a move by their financial professionals from one firm to another, and this right includes receiving personal contact from such persons."

114.    Thus, this letter indicated that Dickes and Stein-Keller intend to announce to clients that they have begun employment at Morgan Stanley, and to accept business from CIBC clients, *in violation of their contractual obligations*.

115.    On July 27, 2022, CIBC's counsel emailed a letter to Dickes' and Stein-Keller's counsel which set forth authority that the contractual prohibition on such announcement and acceptance of business was enforceable and, among other things, stated:

> First, in the course of arguing that the non-accept clause is unenforceable, you assert that "customers have 'a paramount right' to be advised of a move by their financial professionals from one firm to another, and this right includes receiving personal contact from such persons". ...
>          This begs the following questions, that we request immediate answers to today.
> 1)      Do your clients intend to send such an announcement to clients of their employment at Morgan Stanley, either directly or through Morgan Stanley?
> 2)      If so, how do then intend to do that if, as you write, they "have not retained nor are they in possession of any confidential or proprietary information belonging to CIBC, nor have they provided any such information to any third party" and "[m]y clients have neither retained CIBC confidential or proprietary information, nor shared any such

information with Morgan Stanley"?  Ms. Dickes' and Ms. Stein-Keller's contracts with CIBC clearly provide that "client lists" and "information about ... clients (whether personal, financial or otherwise)" constitute Confidential Information (see Section 4(d) of Ms. Dickes' and Ms. Stein-Keller's contracts).  Under Section 4(f) of Ms. Dickes' and Ms. Stein-Keller's contracts, they were required to return to CIBC all Confidential Information to CIBC, as was requested of them.  So client names, email address, phone numbers, and other contact information should not be in Ms. Dickes', Ms. Stein-Keller's, or Morgan Stanley's possession.  Do they or Morgan Stanley have such contact information?

3)        Despite your repeated assurances that your clients will not solicit clients, you refer to a supposed "right [that] includes receiving personal contact from such persons."  a) Will your clients contact clients, which would be a clear violation of the non-solicits that you have repeatedly assured us they intend to abide by?  b) If a client contacts them not to initiate a transfer of their account, but to ask advice on whether they should transfer their account, will your clients advise them to transfer their accounts, which would be a clear violation of the non-solicits which includes not "encourage[ing]" or "induc[ing]"?

(Exhibit 19).

116.    On July 28, 2022, Dickes' and Stein-Keller's last day of employment at CIBC, their attorney emailed a letter reiterating their position that they are legally permitted to make an announcement to clients of their starting at Morgan Stanley, and to accept CIBC clients at Morgan Stanley, *in violation of their contractual obligations.*  (Exhibit 20).

117.    Dickes' and Stein-Keller's attorney denied that they possess CIBC client contact information.  However, he indicated that they could use publicly available contact information online for the clients to make an announcement.

118.    While it is true that publicly available information is not confidential, the *names* of the clients Dickes and Stein-Keller would use to look up their contact information is confidential, even if it is not in writing but in their memories, and *using the names on their clients lists to find their contact information to make an announcement to them would violate their contractual obligations.*

119.    CIBC keeps the names of its clients confidential, unless CIBC has authorization to share those names in specific circumstances.

120.    While Dickes' and Stein-Keller's attorney wrote not to speculate about what they might do, his letters provide a clear inference that a) Dickes and Stein-Keller have memorized confidential client names, b) that they fully intend to make an announcement to clients that they now work at Morgan Stanley after their last day of employment at CIBC on July 28, 2022, c) that they intend to answer calls from these clients, which inevitably after such an announcement will at least implicitly involve soliciting, encouraging, inducing, offering to accept, and accepting business from such clients – *all in violation of their contractual obligations with CIBC not to solicit or divert clients*.

## CLAIM 1
### (Breach of Contract)

121.    Plaintiff repeats and realleges the allegations contained in the previous paragraphs as if separately set forth herein.

122.    Defendants have breached their contractual obligations.

123.    Defendants have indicated that they intend to further breach their contractual obligations.

124.    Because among other things the restrictive covenants in defendants' contracts are reasonable in scope and duration and are reasonably necessary to protect Plaintiff's legitimate interests in its client relationships and goodwill, for which it expended substantial amounts, and to avoid payment financial penalties to Schwab, and are not contrary to the public interest, they are enforceable.

## CLAIM 2
### (Breach of the Faithless Servant Doctrine/Duty of Loyalty/Fiduciary Duty v. Dickes)

125.    Plaintiff repeats and realleges the allegations contained in the previous paragraphs as if separately set forth herein.

126.    During and as a result of her employment by CIBC, Dickes was subject to the faithless servant doctrine, a duty of loyalty to CIBC, and a fiduciary duty to CIBC.

127.    Dickes' conduct, including her April 29, 2022 blast email to CIBC clients announcement that she had given 90 days' notice and then would be joining a new firm, violated the faithless servant doctrine, her duty of loyalty to CIBC, and her fiduciary duty to CIBC.

128.    CIBC seeks disgorgement of Dickes' subsequent compensation, as well as damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Issue an immediate temporary straining order, as well as preliminary and permanent injunctions, enforcing the restrictive covenant clauses in Dickes' and Stein-Keller's employment agreements with CIBC including prohibiting Dickes and Stein-Keller from (a) soliciting, encouraging, inducing, or accepting business from clients they worked with at CIBC (or in Dickes' case, at her prior employer that CIBC purchased including paying Dickes' for her equity in that employer), including making clear that the prohibition on soliciting, encouraging, or inducing precludes making an announcement to their former clients that they are now working at Morgan Stanley, for 6 months for Dickes and 1 year for Stein-Keller from July 28, 2022, (b) possessing and using confidential information such as clients lists (in writing or memorized) and contact information, and (c) soliciting employees of CIBC for 6

28

months from July 28, 2022, award money damages including for prior breaches, and

order disgorgement of Dickes' compensation for the period in which she violated the

faithless servant doctrine; and

2. Award Plaintiff such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury.


Dated:  July 28, 2022

LAW OFFICE OF MICHAEL GRENERT, PLLC



By:_____s/_____
Michael E. Grenert
120 Riverside Blvd., #12T
New York, New York 10069-0524
Telephone:  (917) 553-2050
Facsimile:  (917) 725-8525
Email:  mgrenert@grenertlaw.com
Counsel for Plaintiff

## VERIFICATION

I, John S. Markwalter, Jr., hereby verify that

1.  I am the CEO of CIBC and its immediate parent company, CIBC PWG.
2.  I have reviewed the foregoing Verified Complaint.
3.  I verify under penalty of perjury that the facts set forth in the Verified Complaint are true and correct to the best of my knowledge based on either personal knowledge or communications with relevant knowledgeable individuals.

Executed on July 28, 2022.

John S. Markwalter, Jr.