UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CIBC PRIVATE WEALTH ADVISORS,        :        22 Civ. 06436
INC.                                  :
                                      :
                    Plaintiff,        :
                                      :
              -against-               :
                                      :
ERIN DICKES and EVY STEIN-KELLER,    :
                                      :
                    Defendants.       :
-------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR AN
ORDER TO SHOW CAUSE FOR A TRO AND PRELIMINARY INJUNCTION**

## FACTS

The facts are set forth in Plaintiff CIBC Private Wealth Advisors, Inc.'s ("CIBC" or "Plaintiff") Verified Complaint against Defendants Erin Dickes ("Dickes") and Evy Stein-Keller ("Stein-Keller") (collectively, "Defendants").[1]

## ARGUMENT

I.  **DEFENDANTS' RESTRICTIVE COVENANTS ARE ENFORCEABLE**

    A.  **New York Law Applies Under The Choice-Of-Law Clauses**

While Defendants' counsel has asserted that Texas law applies, New York law applies under the New York choice-of-law clauses in Defendants' employment agreements at issue that Dickes and Stein-Keller signed.

Defendants' employment agreements provide that "The terms of this letter will be governed by, and understood and enforced according to the laws that apply to contracts made and to be performed in the State of New York, without regard to conflict of law principles." (Verified Complaint Exhibits 1 and 2 at Section 5).

Dickes' Seller Member Agreement, by which on July 7, 2017 she sold her equity interests in the business she was employed by to Atlantic Trust Group, LLC, which is now CIBC Private Wealth Group, LLC, also contains a New York choice-of-law clause. (Verified Complaint Exhibit 3).

The employment agreements do not contain choice-of-forum clauses. They contain clauses requiring arbitration "[e]xcept as otherwise provided in Section 4 of this letter". (Verified Complaint Exhibits 1 and 2 at Section 5). Section 4 of the letter agreements provides:

---

[1] All exhibits referenced herein are exhibits to the Verified Complaint.

> *Equitable Remedies*.  You specifically recognize that any breach by it [sic] of this Section 4 will cause irreparable injury to CIBC and that actual damages will be difficult to ascertain, and in any event, may be inadequate. Accordingly, you further expressly consent to the issuance of a temporary restraining order or a preliminary injunction by any court with jurisdiction over you to prohibit the breach of this Section 4.
> (Verified Complaint Exhibits 1 and 2 at Section 4(h)).

At the time Dickes and Stein-Keller went through the process of signing their employment agreements and being hired by CIBC in 2017, CIBC's Human Resources function was based in New York City.  (Verified Complaint ¶ 38).

That is why their employment agreements contained New York choice-of-law clauses. Companies prefer to have employment agreements for their employees governed by one state's laws rather than by many different state's laws, depending on the employee.  That is one main purpose for choice-of-law clauses.  (Verified Complaint ¶ 39).

CIBC Human Resources employees in New York were involved in the process of Dickes' and Stein-Keller's hiring and onboarding as CIBC employees.  (Verified Complaint ¶ 40).

Both Dickes and Stein-Keller were FINRA registered representatives with an affiliate of CIBC, CIBC World Markets Corp.  CIBC World Markets Corp.'s principal place of business is in New York, New York.  (Verified Complaint ¶ 41).

Defendants paystubs state that they are from:  "CIBC Private Wealth Advisors, Inc., 425 Lexington Avenue, New York, NY 10017, United States of America."  (This information was discovered after the Verified Complaint was filed and so is not in it.)

We believe the New York choice of law clauses are enforceable.  "In a diversity case, a court must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).  In New York, courts follow the "substantial relationship" test, under which they will honor the parties' choice of forum in a

contract unless (1) the chosen state has no substantial relationship to the parties; or (2) applying the law of the chosen state would contravene a fundamental policy of a state that has a materially greater interest than does the chosen state. *Estee Lauder v. Batra,* 430 F.Supp.2d 158, 170 (S.D.N.Y.2006) (quoting Restatement (Second) of Conflicts of Law § 187) (citations and quotations omitted). *The Ayco Co. v. Frisch*, 795 F. Supp. 2d 193, 200-01 (N.D.N.Y. 2011)

"It would be inappropriate to judge which state has the most significant contacts with this dispute and perhaps as a result of that analysis to disregard the choice-of-law provision in the Employment Agreement, since the choice of New York law satisfies the [reasonable relationship standard], which is the more recent standard articulated by the New York courts and applied by the Second Circuit where a contract contains a choice-of-law provision. The analysis of which state has the most significant contacts with the dispute remains relevant in those circumstances in which the contract does not contain a choice-of-law clause. *Cap Gemini Ernst Young U.S. LLC v. Nackel,* No. 02 Civ. 6872 (DLC), 2004 WL 569554, at *4 (S.D.N.Y. Mar. 23, 2004), *aff'd,* 98 F. App'x 65 (2d Cir. 2004)." *McPhee v. General Electric International, Inc.*, 736 F. Supp. 2d 676, 680 (S.D.N.Y. 2010)

New York law generally honors contractual choice-of-law provisions. *See id.* (citing *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir. 1987)). *Royal Dispatch Servs., Inc. v. UBS Fin. Servs., Inc.*, 12-CV-2032 (JG) (RLM), at *5 n.4 (E.D.N.Y. July 31, 2012)

"New York has a strong policy favoring enforcement of choice of law provisions in contracts. See Welsbach Elec. Com, v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629 (2006). " *Frank v. Reassure Life Ins. Co.*, 12 Civ. 2253 (KBF), at *10 (S.D.N.Y. Nov. 9, 2012)

"With respect to the breach of contract claims, New York law generally honors choice of law provisions in contracts." *Aon Corp. v. Alliant Ins. Servs., Inc.*, 2014 N.Y. Slip Op. 31735, 8 (N.Y. Sup. Ct. 2014).

Given New York's strong policy of enforcing choice-of-law clauses, the connection to New York in this case is more than sufficient.

**B.    The Clause Prohibiting Accepting Business Is Enforceable**

Stein-Keller's employment agreement prohibits her at Morgan Stanley, for 1 year from the end of her employment with CIBC, not only from soliciting or attempting to solicit business, offering or attempting to offer services, offering to accept business, or otherwise interfering or attempting to interfere with CIBC's relationship with, clients she worked with or learned of at CIBC (as defined in her agreement), but it also says that she cannot "accept" business from such clients.  (Verified Complaint ¶ 60, Exhibit 2 Section 4(a)).  The full application section of her contract provides:

> (a)    *Prohibition on Client Diversion.* You agree to refrain, while employed by CIBC and for a period of **1 year** following the termination of your employment for any reason (the "Non-Competition Period"), from **Diverting or attempting to Divert** from CIBC any Client you learned of or provided services to while affiliated with CIBC, except as expressly provided in writing by an officer of CIBC. For purposes of this Section 4(a), the following terms shall have the following meanings:
>
> (i)    "Account" means an investment or investment account with, through, managed, or otherwise associated with CIBC, regardless of whether the account is charged a fee by CIBC and including without limitation any Alternative Investment Account, as defined in the Representatives' Compensation Guide.
>
> (ii)    "Client" means any person or entity (i) with one or more Accounts; (ii) who or which had one or more Accounts within 12 months prior to your termination of employment with CIBC; and/or (iii) who or which was solicited to open an Account or use Services offered by CIBC within the 12 months prior to your termination of employment with CIBC.

4

(iii)   **"Divert" means *directly or indirectly* (i) solicit or attempt to solicit business; (ii) offer or attempt to offer Services (as defined below); (iii) accept or offer to accept business from or payments for Services from; or (iv) otherwise interfere or attempt to interfere with any Company relationship.**

(iv)   "Services" means all activities relating to offering investment management and advice on publicly traded securities to any person or entity by any means. Services includes but is not limited to management of hedge or mutual funds or commingled or separate investment account vehicles. Services further includes but is not limited to research analysis, portfolio management, financial planning and any activity that supports investment management and advice. Services excludes management or investment services to any private equity fund or any similar investment fund that specializes solely in investments in private companies not listed on any public stock exchange.

(Verified Complaint ¶ 60, Exhibit 2 Section 4(a) (emphasis added)).

On July 21, 2022, Defendants' attorney emailed a letter to CIBC's counsel stating, among other things: "However, your insistence that my clients may not accept customer transfer requests based on Ms. Stein-Keller's contract is simply unsupportable under FINRA rules and the caselaw construing these rules." (Verified Complaint ¶ 112, Exhibit 18).

On July 28, 2022, Dickes' and Stein-Keller's last day of employment at CIBC, their attorney emailed a letter to CIBC's counsel reiterating their position that they are legally permitted to make an announcement to clients of their starting at Morgan Stanley, and to accept CIBC clients at Morgan Stanley, *in violation of their contractual obligations.* (Exhibit 20).

Thus, these letters indicated that Dickes and Stein-Keller intend to accept business from CIBC clients at Morgan Stanley, *in violation of their contractual obligations*. (Verified Complaint ¶ 114).

Note that Dickes and Stein-Keller functioned as a team, and that for all of Stein-Keller's clients Dickes was the lead Relationship Manager. (Verified Complaint ¶ 76).

Defendants' counsel asserted in letters to CIBC that the non-acceptance clause is unenforceable under FINRA Rule 2140 (and previously asserted that a non-compete would be unenforceable under that rule), and cited case law relying on that rule.

FINRA Rule 2140 provides:

> No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account. Nothing in this Rule shall affect the operation of Rule 11870.

FINRA Rule 2140 is inapplicable to CIBC, however, as it is not a FINRA member firm, and the case law cited below confirms that.  Defendants were indeed FINRA registered representatives with an affiliate of CIBC, CIBC World Markets Corp., a broker-dealer FINRA member firm.  (Verified Complaint ¶ 65).  Defendants were also both SEC-registered investment advisors through CIBC, which is itself an SEC-registered investment advisor but is not a FINRA member firm.  (Verified Complaint ¶ 63-64).

However, Defendants were employees of CIBC (CIBC Private Wealth Advisors Inc.), the SEC-registered investment advisor, not CIBC World Markets Corp. the FINRA member firm. (Verified Complaint ¶ 1, 18, 19, 61 ).

In addition, for almost all of their activities, Dickes and Stein-Keller did not need to be FINRA registered representatives.  (Verified Complaint ¶ 67).  For almost all of their activities, they functioned as SEC-registered investment advisors, not FINRA registered representatives. (Verified Complaint ¶ 67).  CIBC has SEC-registered investment advisors become FINRA registered representatives through CIBC World Markets Corp. only so they have the ability under

the applicable rules and regulations to solicit business and receive direct compensation for clients who invest in specific alternative investment offerings (i.e., private limited partnership funds) (beyond recommending the use of alternatives as a general asset allocation decision).  (Verified Complaint ¶ 68).  The portion of client assets invested such that Dickes and Stein-Keller were required to be FINRA registered investment advisors was insignificant.  (Verified Complaint ¶ 69).  And neither Dickes nor Stein-Keller has engaged in recent activity like this for which they were required to be FINRA registered representatives.  (Verified Complaint ¶ 70).  Furthermore, all of Dickes' and Stein-Keller's clients signed Investment Management Agreements with CIBC, the SEC-registered investment advisor -- not the FINRA member firm CIBC World Markets Corp. (Verified Complaint ¶ 66).

Right on point is *The Ayco Co. v. Frisch*, *supra*, 795 F. Supp. 2d 193, 196, 208 (N.D.N.Y. 2011), in which Ayco was not a FINRA member firm but "[a]s a condition of employment, both Defendants were required to become licensed as registered representatives of FINRA," and the court stated:

> Finally, the Court reiterates its finding in *Feldman* that Ayco is not a FINRA member and therefore not subject to FINRA rules, which Defendants have cited as support for their argument that the Agreement is injurious to the public, and that **Ayco's affiliation with Mercer, a FINRA member, does not bind Ayco to follow FINRA rules**. *Id.* at *10....

(Emphasis added).  The court granted a preliminary injunction enforcing a non-compete, and confidentiality clause covering client lists, against FINRA registered representatives, after having granted a TRO.

Defendants in that case appealed the Court's grant of injunctive relief to the Second Circuit.  "On appeal, Defendants moved the Second Circuit to stay both the TRO and the preliminary injunction, but the motions were denied on September 20, 2011 because Defendants

7

had failed to satisfy Federal Rule of Appellate Procedure 8. Dkt. No. 44 ("Mandate"). In

addition, the Second Circuit noted in its Mandate that it believed Defendants had "failed to make

a strong showing that they [were] likely to succeed on the merits on appeal" Id. (internal

quotation marks and citation omitted).  *Ayco Co. v. Frisch*, 1:11-CV-0580 (LEK/TWD), at *2 n.1

(N.D.N.Y. Jan. 17, 2013)

 Similarly right on point is *Ayco Co., L.P. v. Feldman*, 1:10-CV-1213 (GLS/DRH), 2010

WL 4286154, at *3, 18 (N.D.N.Y. Oct. 22, 2010), which found that, while "[a]s a condition of

employment, Ayco required Feldman to become licensed as a registered representative of

FINRA," it found that "**FINRA Rule 2140 provides, ....  This Rule is inapplicable to Ayco, as**

**Ayco is not a FINRA member**. The limited relationship between Ayco and Mercer, which is a

FINRA member, <u>see</u> Cavoli Decl. (Dkt. No. 16-1), does not bind Ayco to comply with FINRA

rules."  (Emphasis added).  The court also granted a preliminary injunction enforcing a non-

compete, and confidentiality clause covering client lists, against FINRA registered

representatives, after having granted a TRO.

 *See also American Express Financial Advisors, Inc. v. Scott*, 955 F. Supp. 688 (N.D. Tex.

1996) (in enforcing a non-solicit, the court held that "Defendant's argument that the 'rules and

practices of the securities industry' apply to and govern this lawsuit is inapposite").

 If non-competes can be enforced by a non-FINRA firm against FINRA registered

representatives, certainly the lesser restrictions imposed by the non-acceptance clause with CIBC

can be enforced.

 Cases not involving FINRA Rule 2140 also have enforced non-solicits that include non-

accept clauses.  *Marsh USA Inc. v. Schuhriemen, supra*, at 532 n.1 (S.D.N.Y. 2016), where the

court's preliminary injunction also enforced the non-solicit's provision prohibiting "*servicing of*

*clients* who voluntarily decide to transfer their business without solicitation" (emphasis added); *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 103-04 (S.D.N.Y. 2021) (granting preliminary injunction barring insurance broker from "soliciting *or servicing*" clients, stating that "Indeed, "[s]uch [non-solicitation of clients] agreements are not found overbroad even if they would prohibit the employee from accepting business from former clients who voluntarily and without any solicitation chose to continue to do business with the employee." (emphasis added))*; Chernoff Diamond v. Fitzmaurice, Inc.*, 234 A.D.2d 200 (N.Y. App. Div. 1996) (upholding preliminary injunction enforcing non-solicit clause prohibiting former employee from soliciting or "provid[ing] services to" former clients (emphasis added)); *Merrill Lynch v. Fishman*, Index No. 121006/00 (Sup.Ct. N.Y. Co. 2000) (characterized by *United States Trust Co., N.A. v. Maclachlan*, 2008 N.Y. Slip Op. 30030, 5 (N.Y. Sup. Ct. 2008) as "enjoining defendant from soliciting business of former clients or accepting business resulting from improper solicitation, and disclosing confidential information." (emphasis added)); *Aon Risk Servs. v. Cusack*, 946 N.Y.S.2d 65 (N.Y. Sup. Ct. 2011) ("Indeed, these covenants do not prevent Cusack from working for Alliant, but merely prevent him, for a period of two years, from soliciting and doing business with those Aon clients with whom he worked or became familiar with during his time at Aon (*see Arpac Corp. v. Murray,* 226 Ill.App.3d 65, 168 Ill.Dec. 240, 589 N.E.2d 640, *supra* [non-solicitation covenants enforceable if restrictions are reasonably related to the employer's interest in protecting customer relations employees developed while working for employer])." (emphasis added)).  While New York, not Texas law, applies "The Texas Supreme Court specifically held in *Alex Sheshunoff Management Services, L.P. v. Johnson* that if an employer provides confidential information to an employee who has promised in return to preserve the confidences of the employer, then a non-competition covenant executed as part of

that agreement is enforceable." *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 535 (5th

Cir. 2020). *See also Ally Fin., Inc. v. Gutierrez*, No. 02-13-00108-CV, at *20 (Tex. App. Jan. 23,

2014) (citing *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 289-90 (5th Cir. 2012)

approvingly as "holding non-compete covenant enforceable because covenant limited to

'accounts [employees] worked while employed').

      Restrictive covenants are generally enforceable when arising in connection with a

business owner's sale of their ownership interest. Here, pursuant to Dickes' Seller Member

Agreement, she received substantial compensation for her equity share of Geneva Advisors. In

addition, Dickes received over $1 million as a retention payment. (Verified Complaint ¶ 51).

Dickes' employment agreement explicitly provides that its restrictive covenants were part of

CIBC's purchase of Geneva Advisors, including Dickes' equity in Geneva Advisors (the

restrictive covenants in Dickes' employment agreement were in addition to restrictive covenants

in her Seller Member Agreement including a non-compete that expired before her employment

with CIBC ended). Dickes' employment agreement provides: "You understand and

acknowledge that the **restrictive covenants and other agreements contained in this**

**Section 4 are an essential part of this letter and the transactions contemplated by**

**the Purchase Agreement and that CIBC would not have agreed to the transactions**

**contemplated by the Purchase Agreement if not for such restrictive covenants and**

**other agreements**." (Verified Complaint ¶ 55, Exhibit 1 Section 4(g) (emphasis added)).

      Among CIBC's other legitimate protectable interests supporting making enforcing the

non-accept clause particularly compelling, the vast majority of Defendants' clients and client

assets were not originated by Defendants, but rather were paid for by CIBC directly to Schwab

as part of a referral arrangement, or indirectly by purchasing the firm where Defendants had been

employed just prior to CIBC that also had a referral arrangement with Schwab, or were re-assigned to Defendants from a CIBC financial advisor who died.  The vast majority of Dickes' and Stein-Keller's clients and client assets were obtained through (a) CIBC's referral arrangement with Schwab, for which CIBC compensates Schwab, (b) a similar referral arrangement between Schwab and Geneva Advisors, where Dickes and Stein-Keller were employed until CIBC purchased Geneva Advisors (including Dickes' equity in it) in 2017 for over $100 million, or (c) CIBC's assignment to them of clients of James Arado, a founding partner of Geneva Advisors who joined CIBC in 2017, upon his death in 2018.  In sum, Dickes and Stein-Keller did not independently originate the vast majority of their business with the clients they had at CIBC, but obtained them as a result of referral arrangements with Schwab that CIBC paid for either directly or indirectly through purchasing Geneva Advisors, or by CIBC's decision to reassign Arado's clients to them upon his death.  (Verified Complaint ¶ 4, 71-72)

CIBC has thus spent significant sums of money obtaining and establishing goodwill with the clients, including but not limited to by purchasing Geneva Advisors and by paying Schwab for client referrals.  (Verified Complaint ¶ 73)

Furthermore, in addition to paying Schwab and paying to purchase Geneva Advisors, CIBC has paid substantial sums to Defendants to contribute towards maintaining goodwill in these client relationships.  Pursuant to Dickes' Seller Member Agreement, she received substantial compensation for her equity share of Geneva Advisors.  In addition, Dickes received over $1 million as a retention payment.  (Verified Complaint ¶ 51)  CIBC has paid Dickes approximately $2.4 million in the 12 months preceding her resignation (Verified Complaint ¶ 77), and significantly more in the 5 years she has been at CIBC.  CIBC has paid Stein-Keller

approximately $190,000 in the 12 months preceding her resignation (Verified Complaint ¶ 78), and significantly more in the 5 years she has been at CIBC.

Not only did CIBC pay substantial sums for the clients referred by Schwab to CIBC or Geneva Advisors, but also if these clients were to move their business to Dickes and Stein-Keller at their new employer Morgan Stanley, CIBC would be required to pay substantial contractual fees to Schwab – both on clients that had been referred by Schwab during Dickes' and Stein-Keller's employment at CIBC, and on clients that had been referred by Schwab to Geneva Advisors.  (Verified Complaint ¶ 74)

Thus, Stein-Keller's non-accept clause is enforceable.  (Note that CIBC has no issues with Ms. Dickes and Ms. Stein-Keller contacting and soliciting and accepting business from their immediate family members, their parents, and their siblings.)  Stein-Keller's non-accept clause should be applied not only to her, but to others at Morgan Stanley including Dickes, at least as to clients that fall within the definition in Stein-Keller's contract, as Stein-Keller's contract prohibits from "directly or indirectly" accepting such business.  Moreover, Dickes was the lead Relationship Manager at CIBC on Stein-Keller's clients.

### C.     Defendants' Making An Announcement To Clients That They Are At Morgan Stanley Violates Their Non-Solicitation/Encouragement/Inducement Clauses, Which Are Enforceable To Prohibit Such Announcements

Defendants' employment with CIBC ended July 28, 2022, so presumably they are commencing employment with Morgan Stanley on or about July 29, 2022.  (Verified Complaint ¶ 13-14, 79).

Dickes' employment agreement prohibits her, for 6 months from the end of her employment with CIBC, from soliciting, encouraging, or inducing clients she worked with or became acquainted with at CIBC (as defined in the agreement) to engage her at her new employer

Morgan Stanley, or to otherwise engage Morgan Stanley. (Verified Complaint ¶ 55, Exhibit 1 Section 4(b)).   Stein-Keller's employment agreement prohibits her at Morgan Stanley from soliciting or attempting to solicit business, offering or attempting to offer services, accepting or offering to accept business, or otherwise interfering or attempting to interfere with CIBC's relationship with, clients she worked with or learned of at CIBC (as defined in her agreement).   (Verified Complaint ¶ 60, Exhibit 2 Section 4(a)).

In a May 4, 2022 letter to CIBC's counsel, Defendants' attorney claimed that FINRA Rule 2273 requires departing registered representatives to deliver a communication to former clients upon change of firms regarding their new employment status, indicating that they intended to *violate their contractual obligations by making an announcement to clients upon starting at Morgan Stanley that they were now working* there.   (Verified Complaint ¶ 108, Exhibit 17).

On July 21, 2022, Dickes' and Stein-Keller's attorney emailed a letter to CIBC's counsel stating, among other things:   "However, your insistence that my clients may not accept customer transfer requests based on Ms. Stein-Keller's contract is simply unsupportable under FINRA rules and the caselaw construing these rules."   (Verified Complaint ¶ 112, Exhibit 18).   That letter also asserted that "customers have 'a paramount right' to be advised of a move by their financial professionals from one firm to another, and this right includes receiving personal contact from such persons."   (Verified Complaint ¶ 113, Exhibit 18).   Thus, this letter indicated that Dickes and Stein-Keller intend to announce to clients that they have begun employment at Morgan Stanley, *in violation of their contractual obligations*.   (Verified Complaint ¶ 114).

Ample case law, however, holds that such an announcement would constitute solicitation in violation of Defendants' agreements.   For example, in this New York case, the court stated:

> The Court, however, does not find Mr. Schuhriemen's alternative
> explanations of his apparent involvement in solicitation to be convincing.

> Mr. Schuhriemen's notice announcing his employment at Alliant was not a
> general announcement, but was communicated, as Mr. Schuhriemen's
> counsel put it, to "the contacts that Bob Schuhriemen could remember,
> including his clients." Transcript of Oral Argument dated April 28, 2016
> ("Tr."), 10:14–16. Notably, Mr. Schuhriemen's counsel conceded that
> these clients would have included some who might not have been Mr.
> Schuhriemen's "personal clients" within the meaning of *BDO Seidman.*
> *See* Tr. 10:18–21. Under these circumstances, the Court finds that Marsh is
> likely to be able to show that Mr. Schuhriemen solicited former Marsh
> clients".

*Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016) (granting

preliminary injunction prohibiting insurance broker from soliciting clients).  *See also Corporate*

*Techs., Inc. v. Harnett*, 731 F.3d 6, 8, 12 (1st Cir. 2013) (In upholding preliminary injunction

enforcing non-solicitation clause, the court stated that "When a valid non-solicitation covenant is

in place and an employee departs for greener pastures, the employer ordinarily has the right to

enforce the covenant according to its tenor. That right cannot be thwarted by easy evasions, such

as piquing customers' curiosity and inciting them to make the initial contact with the employee's

new firm. As we shall explain, this is such a case. ... Even though we have entertained the

parties' supposition that it was the customers who made the initial contacts, the record shows that

those customers reached out to Harnett only in response to a blast email from OnX. While we do

not question the rights of parties to make public announcements of changes in employment,

'targeted mailings' to former customers may cross the line into impermissible solicitation.");

*Merrill Lynch v. Schultz, III*, No. 01-0402, 2001 WL 1681973 (D.D.C. Feb. 26, 2001) (finding

that despite the "announcement" label the defendant financial consultant put on it, his "initiated,

targeted contact" in announcing his resignation to former clients was "tantamount to solicitation"

"because there is no reason to believe that a customer on the receiving end of such a phone call

does not assume that the broker wishes for him to transfer his account").

14

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 619 (N.D. Ill. 2000), a case Defendants' counsel in a letter to CIBC's counsel, finding an announcement not to be solicitation, does not apply New York law per the parties' choice-of-law clauses.  Furthermore, it is readily distinguishable in this it relies on the fact that so many of the defendant's clients were his long-term friends who he brought to Merrill Lynch, which is not the case here.  (Verified Complaint ¶ 4, 71-72).

Defendants' counsel stated in his May 4, 2022 letter, "FINRA Rule 2273 similarly requires departing registered representatives to deliver a communication to former clients upon change of firms regarding their new employment status. FINRA has further opined that such notice as required by Rule 2273 'by itself and of its own terms cannot reasonably be considered to encourage or discourage transfer of assets' and is not, therefore, solicitation. See Comments to Rule 2273, Federal Register Vol. 81, No. 60, p. 17518."

FINRA Rule 2273 provides as follows:

> 2273. Educational Communication Related to Recruitment Practices and Account Transfers
>
> **(a) Educational Communication Delivery Requirement**
> A member that hires or associates with a registered person shall provide to a former customer of the registered person, individually, in paper or electronic form, an educational communication prepared by FINRA when (1) the member, directly or through that registered person, individually contacts the former customer of that registered person to transfer assets or (2) the former customer of that registered person, absent individualized contact, transfers assets to an account assigned, or to be assigned, to the registered person at the member.
>
> **(b) Means and Timing of Delivery**
> (1) A member shall deliver the communication in paragraph (a) at the time of first individualized contact with a former customer by the registered person or the member regarding the former customer transferring assets to the member.

(A) If the contact is in writing, the written communication required in paragraph (a) must accompany the written communication. If the contact is by electronic communication, the member may hyperlink directly to the educational communication.

(B) If the contact is oral, the member or registered person must notify the former customer orally that an educational communication that includes important considerations in deciding whether to transfer assets to the member will be provided not later than three business days after the contact. The educational communication must be sent within three business days from such oral contact or with any other documentation sent to the former customer related to transferring assets to the member, whichever is earlier.

(2) If a former customer attempts to transfer assets to an account assigned, or to be assigned, to the registered person at the member, but no individualized contact with the former customer by the registered person or member occurs before the former customer seeks to transfer assets, the member shall deliver the educational communication in paragraph (a) to the former customer with the account transfer approval documentation.

(3) The delivery of the communication required by paragraph (a) shall apply for a period of three months following the date the registered person begins employment or associates with the member.

Contrary to Defendants' counsel's assertion, FINRA Rule 2273 is designed in this instance to regulate the recruiting firm's communications, i.e., Morgan Stanley's communications.  Federal Register Vol. 81, No. 60 emphasizes that "FINRA states that it does not intend the proposed rule [2273] to impact any contractual agreement between a representative and his or her former firm or new firm ... FINRA notes that the proposed rule change assumes that recruiting firms and representatives will act in accordance with the contractual obligations established in employment contracts."

Thus, the contractual prohibitions in Defendants' employment agreements on soliciting, encouraging, or inducing clients to engage them or their new employer Morgan Stanley include

16

prohibiting them from making an announcement to their former clients that they are now working at Morgan Stanley, and are enforceable.

  **D.  Using Memorized Client Names To Look Up Their Contact Information**
     __Violates Defendants' Confidentiality Clauses__

    Defendants' attorney has further indicated that to make such an announcement to clients, Defendants can use the confidential client names that they have memorized to look up the clients' publicly available contact information online to make such an announcement.  (Verified Complaint ¶ 11).  It appears from their lawyer's communications that Dickes and Stein-Keller intend to start working at Morgan Stanley on Friday, July 29, 2022, and to immediately use confidential client names they have memorized to look us the clients' contact information online, to make announcements to their CIBC clients that they are at Morgan Stanley, *in violation of their contractual obligations to CIBC.*  (Verified Complaint ¶ 14).  This is conveyed by Defendants' attorneys' July 28, 2022 letter.  (Verified Complaint ¶ 117, Exhibit 20).

    However, while it is true that publicly available information is not confidential, the *client names* are confidential and subject to the confidentiality clauses in Defendants' contracts, meaning using them would be *in violation of their contractual obligations not to use such confidential information.*  (Verified Complaint ¶ 11, 118).  CIBC keeps the names of its clients confidential, unless CIBC has authorization to share those names in specific circumstances.  (Verified Complaint ¶ 119).

    Defendants' contracts' confidentiality clauses specifically include "**client lists**" and "**information about** suppliers, employees,  and **clients (whether personal, financial or otherwise) ("Confidential Information")**.  (Verified Complaint ¶ 55, Exhibit 1 Section 4(d); Exhibit 2 Section 4(d) (emphasis added)).   The clause specifically covers "Confidential

Information," not just confidential documents, so the fact that Defendants may not have a client

list document but have memorized the names of their clients does not circumvent their contracts.

Therefore, Defendants should be enjoined from using client names, including from

memory, to obtain contact information to use to contract the clients CIBC has spent such much

money obtaining and maintaining goodwill with.

### E.    The Non-Solicit Of Employees Clause Is Enforceable

Defendants, in their attorneys' multiple letters to CIBC's counsel, has not challenged the

enforceability of their contractual non-solicit of employees clauses.  A TRO and preliminary

injunction should include these clauses.

## II.    A TRO AND PRELIMINARY INJUNCTION SHOULD BE ISSUED

Defendants' employment agreements contain clauses consenting to a TRO and preliminary

injunction to enforce the restrictive covenants:

> *Equitable Remedies*.  You specifically recognize that any breach by it [sic]
> of this Section 4 ["Restrictive Covenants"] will cause **irreparable injury**
> to CIBC and that actual damages will be difficult to ascertain, and in any
> event, may be inadequate.  Accordingly, you further **expressly consent to
> the issuance of a temporary restraining order or a preliminary
> injunction** by any court with jurisdiction over you to prohibit the breach of
> this Section 4.
> (Verified Complaint Exhibits 1 and 2 at Section 4(h) (emphasis added)).

The Second Circuit has recognized such a clause as significant and possibly an

admission.  In *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999), the Second Circuit

found it significant that "the employment contract sought to be enforced concede[d] that in the

event of [the defendant's] breach of the post-employment competition provision, [the plaintiff]

shall be entitled to injunctive relief, because it would cause irreparable injury."  The Court

explained that this provision "might arguably be viewed as an admission by [the defendant] that

[the] plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision." *Id.  See also Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 106 (S.D.N.Y. 2021).

CIBC will suffer substantial and irreparable harm if Defendants are permitted to breach their contracts.  Among other things, CIBC's current and potential future ability to maintain relationships with the CIBC clients serviced by the defendants will be drastically compromised. (Verified Complaint ¶ 16).  As discussed above, CIBC has spent considerable sums of money obtaining and maintaining these relationships.


Dated:  July 29, 2022

LAW OFFICE OF MICHAEL GRENERT, PLLC


By:_____s/_____
Michael E. Grenert
120 Riverside Blvd., #12T
New York, New York 10069-0524
Telephone:  (917) 553-2050
Facsimile:  (917) 725-8525
Email:  mgrenert@grenertlaw.com
Counsel for Plaintiff

19